**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
**CHRISNAV YACHTING, LTD.,**                            :
                                                        :
                   **Plaintiff,**        :
                                                        :   **05 Civ. 6609 (HB)**
       - against -                              :
                                                        :   <u>**OPINION & ORDER**</u>
**LLOYD'S UNDERWRITERS, Syndicate No. 1861**            :
**(BRM), Syndicate No. 1084 (HAY), and Syndicate**      :
**No. 2488 (AGM), and GE FRANKONA**                     :
**REINSURANCE, LTD.**                                   :
                   **Defendants.**       :
------------------------------------------------------------------------x
**Hon. HAROLD BAER, JR., District Judge:**

      Plaintiff Chrisnav Yachting, Ltd. ("Plaintiff" or "Chrisnav"), a Greek corporation whose managing director is Nicholas Christodoulopoulos, has brought the instant case against their insurers, certain Lloyd's of London underwriters and GE Frankona Reinsurance, Ltd. ("Defendants" or "Underwriters"), for recovery on a marine hull and machinery policy purportedly covering damage to Plaintiff's yacht M.V. ELIKI.

      Defendants now move for summary judgment to, <u>inter alia</u>, 1) dismiss Plaintiff's complaint entirely, or otherwise seek a declaratory judgment that the insurance contract is null and void; 2) dismiss Plaintiff's claims for bad faith and exemplary damages; and 3) seek a declaratory judgment absolving Defendants of liability under the insurance contract for certain indirect costs claimed by Plaintiffs. For the reasons articulated below, Defendants' motion is granted in part and denied in part.

### I.    BACKGROUND

      Plaintiff Chrisnav has owned the M.V. ELIKI yacht since 1990. Nicholas Christodoulopoulos Declaration, ¶ 3 ("Christo. Decl."). Nicholas Christodoulopoulos has served as the managing director of Chrisnav since 1999. <u>Id.</u> at ¶ 4.[1] He is a former Greek

---

[1] Nicholas Christodoulopoulos has served as the managing director of several yacht-owning entities, including Chrismar Yachting, Ltd., a separate corporate entity that owned a different ship named the M.V. CHRISTINA until it was sold in 2004. Christo. Decl. ¶ 4; Def. Facts ¶ 24. Christodoulopoulos, on at least one occasion, appears to have used Chrisnav and Chrismar letterhead interchangeably when writing letters. <u>See</u> Def. Facts ¶ 37.

maritime lawyer and currently the president of a London financial company that loans money to businesses to purchase yachts.  Defendants' Statement of Material Facts ¶ 22-23 ("Def. Facts").

### a. 2003 Policy Negotiations

In January 2003, Nicholas Christodoulopoulos negotiated the renewal of the marine hull and machinery policy for the M.V. ELIKI through Chrisnav's London insurance broker, Heath Lambert Group ("HLG").  Christo. Decl. ¶ 76. The underwriters sought to raise the premium by 20 percent.  Christo. Decl. ¶ 76, 78, 79.  During the negotiations, Christodoulopoulos faxed a letter to his brokers stating that "our zero loss records for 25 years demonstrate our continuity, loyalty, and prudent/safe management."  Id.; see also Christo. Decl., Ex. QQ.  Eventually, the underwriters agreed to a 10 percent rise in premium with a shorter coverage period and increased deductible.  Christo. Decl. ¶ 78.

Previously, the "N&P Partnership," a partnership composed of Nicholas Christodoulopoulos and his brother Panayiotis, owned another ship, the M.V. KASSANDRA, from 1988 to February 7, 1994.  Plaintiff's Statement of Material Facts ¶ 5 ("Pl. Facts").  On February 7, 1994, the N&P Partnership sold the KASSANDRA to new owners (the "Kassandra Yachting Company," or "KYL") for $3.5 million.  Id. Pursuant to the terms of the sale, the N&P Partnership provided a loan of $3 million to the new owners.  In return, the new owners provided the N&P Partnership with, inter alia, a mortgage on the KASSANDRA and Loss Payee status on KASSANDRA's marine hull policy, and assigned the marine hull policy to N&P to the extent of the loan.  Id. Nicholas Christodoulopoulos separately purchased Mortgagee's Interest Insurance for his interest in the loan.  Id.

On June 30, 1994, the KASSANDRA was destroyed by fire.  Pl. Facts ¶ 5.  The new owners defaulted on the loan from the N&P Partnership.  Id.  The N&P Partnership subsequently brought suit in the Southern District of New York against the marine hull underwriters as an assignee of the marine hull policy.  Id.  The N&P Partnership settled the marine hull claim for $1.375 million.  Nicholas Christodoulopoulos subsequently settled the Mortgagee's Interest Insurance claim for $490,000.  Id.

### b. Move to Psychalis Shipyard

On December 8, 2003, Nicholas Christodoulopoulos informed his brokers by letter that the ELIKI was scheduled to move to the Psychalis shipyard "in order to undergo certain repairs and maintenance for a period of about two week[s]," and asked the brokers to "please advise Underwriters accordingly." Def. Facts ¶ 37. Christodoulopoulos stated that "the Owners have decided to modernize, refit and upgrade the yacht at substantial cost." Id.

The Underwriters, relaying their message through the brokers, then asked Christodoulopoulos on December 9 how long the work would take; at what cost; whether the value of the vessel would increase; whether "hot work" was required; and the experience and records of the shipyard. Def. Facts ¶ 39. The brokers' letter to Christodoulopoulos relaying the Underwriters' message stated "Warranted laid up alongside at approved berth in yard," and "Additional premium to be agreed depending on above information." Id. Christodoulopoulos responded on December 10 that the value of the ship would not increase; that "minor" work would take about three weeks and cost less than 10,000 Euros; and additionally, "hot work" would be required only to weld certain pieces on the exterior of the hull such as placing protective cover. Id. at ¶ 42. Christodoulopoulos also stated that "[t]he vessel will be laid up along side at the yard's berth." Defendant's Ex. G, Ex. 23. The Underwriters then agreed on December 11 to insure the ship without an extra premium. Def. Facts at ¶ 44.

On December 10, the ELIKI arrived at Psychalis shipyard. Def. Facts ¶ 46. According to Defendants, the ship was moored to an "old laid-up open type navy car carrier." Def. Facts ¶ 47. According to Plaintiffs, the ship was "moored alongside the barge, or landing craft, that was converted for use as an extension of the pier" at Psychalis. Pl. Facts ¶ 47. Plaintiffs called this arrangement "stable and secure." Id. Defendants alleged that the ELIKI "was moored in the vicinity of several laid-up merchant ships" and "some of the ELIKI's mooring lines were attached to several of these merchant vessels." Def. Facts ¶ 48. Plaintiffs respond that "this is a normal practice… when several ships are moored in shipyards one next to the other or when they are laid-up." Pl. Facts ¶ 48.

### c. Damage to ELIKI and Repairs

3

On December 23, 2003, the ELIKI was damaged as the result of a severe storm. A large ship broke free of her moorings, and collided with another passenger vessel, pushing that vessel into ELIKI and ELIKI in turn into another ship.  Def. Facts ¶ 50.

On January 2, 2004, Nicholas Christodoulopoulos began "debris removal."  Pl. Facts ¶ 56.  (Defendants term this work "steel reparations."  Def. Facts ¶ 56.)  Over two weeks after the incident, on January 7, 2004, Nicholas Christodoulopoulos notified the Underwriters (through his brokers) of the loss.[2]  The Underwriters appointed their surveyors, Stewart & Hazell, to survey the damages, and Chrisnav appointed its own consultant, Stelios Dassiras, as well. Def. Facts ¶ 54, 57. The parties agreed that steel repairs would be done at Psychalis and other repairs at smaller shipyards.  Def. Facts ¶ 60.  On January 14, the Underwriters' surveyors emailed a preliminary report to Chrisnav's brokers, which the brokers subsequently faxed to Christodoulopoulos, stating that "[w]e are of the opinion that the original mooring arrangements of ELIKI, as reported, were sufficient."  Christo Decl., Ex. L at 7.

Repairs proceeded at Psychalis through March 2004 with periodic inspections by the parties.  Def. Facts at ¶ 62.  On April 2, 2004, ELIKI sailed to the Vertopolous drydock for further repairs.  There, Defendants allege, Plaintiffs performed "owner's work" (i.e. installing a bow thruster) in addition to repairing the storm damages.  Def. Facts ¶ 65.

### d. Claim Adjustment

On April 15, 2004, Chrisnav presented the Underwriters' surveyors with invoices for repairs to date totaling 89,254 Euros.  Def. Facts ¶ 68.  The Underwriters' surveyors, in a writing marked "without prejudice," approved an initial payment of $46,267.43, which less the $24,000 deductible, resulted in an authorized payment of $22,267.43.  Def. Facts ¶ 69.  On June 1, 2004, the Underwriters sent a payment of $20,000 pursuant to this authorization.  Def. Facts ¶ 74.  Repairs completed on July 30, 2004.  Id. at ¶ 75.

---

[2] Plaintiff's foreign law expert references that Plaintiff first mistakenly gave notice to its P&I insurers.  See Arditti Decl. at ¶ 35.  However, this fact does not appear to be mentioned in Plaintiff's briefs or Statement of Undisputed Facts.

4

On September 8, 2004, Chrisnav presented the Underwriters' surveyors with a second set of invoices totaling 345,930.77 Euros (including the amounts claimed in their first invoices). Def. Facts ¶ 76.

On October 25, 2004, the Underwriters' surveyors provided Chrisnav with a "rough indication" of the eventual approved amount of 186,968.45 Euros. Def. Facts ¶ 77. On December 28, 2004, the Underwriters' surveyors issued their final report to the Underwriters, including an analysis and the final adjustment of the claim. Def. Facts ¶ 78.

Over the next several months, the Underwriters asked for additional information from Chrisnav which Chrisnav provided. Def. Facts ¶ 79-84. On April 29, 2005, the Underwriters offered to settle the claim for 245,320 Euros, less payment of US $20,000 and deductible of US $24,000. Def. Facts ¶ 85. The offer was "without prejudice and subject to… reservations of rights." Id. The Underwriters also refused to provide Chrisnav with a copy of the surveyors' report. Id.

After a short exchange of letters, Chrisnav filed this lawsuit on July 22, 2005. The Underwriters withdrew their settlement offer on August 16, 2005. Def. Facts ¶ 89.

## II.   STANDARD OF REVIEW

A court will not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 250 (1986). In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities, and draw all inferences, against the moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam ); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir.1987). Whether a fact is "material" is determined by the substantive law defining the claims. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248. However, a disputed issue of material fact alone is insufficient to deny a motion for summary judgment; the disputed issue must be "material to the outcome of the litigation," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir.1986), and must be backed by

evidence that would allow "a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The parties agree that British law governs the case, as provided for by the policy's choice-of-law provision. Defendant Underwriters Appendix of Exhibits, Ex. G, Ex. 17 ("Def. Exhibits"). The policy's forum selection clause provides for venue in New York. Id. Subject matter jurisdiction is based on admiralty. See 28 U.S.C. § 1333(1).

### III.    DISCUSSION

Defendant Underwriters essentially move for summary judgment on three issues. First, they seek to entirely avoid the contract based on various alleged misrepresentations and breaches of contract by Chrisnav. Secondly, they seek to dismiss Chrisnav's claims for exemplary damages based on bad faith and egregious claims settlement conduct, arguing that British law provides no such remedy. Lastly, they seek judgment that under British law, the policy does not cover certain minor costs claimed by Chrisnav, such as crew wages.

I will address each set of issues in turn.

#### a. **Avoidance of Contract**

##### i. Alleged Loss Record Misrepresentation

Defendant Underwriters argue that Christodoulopoulos' statement of "zero loss records for 25 years" is a material misrepresentation during contract renewal negotiations that, under British law, allows them to entirely avoid the insurance contract from its inception. Jacobs Decl. ¶ 35. To avoid the contract, Defendants aver they must demonstrate that the insurer relied on the misrepresentation and that the insurance market would regard the misrepresentation as "material." Jacobs Decl. ¶ 38. "Materiality" is defined as that "which would influence the judgment of a prudent insurer in fixing the premium, or determining whether he will take the risk. Id. at ¶ 36, citing Marine Insurance Act of 1906, § 20(2).[3] "Materiality" is a question of fact in the underwriting

---

[3] Defendants alternatively argue that Chrisnav's statement as to prior loss records amounted to nondisclosure, if not misrepresentation. The definition of "materiality" in the context of a nondisclosure is

6

market. Jacobs Decl. ¶ 38. Defendant's underwriter testified that he believed Christodoulopoulos' statement regarding the loss records would have been material. Def. Exhibits, Ex. K (Thompson Deposition), at 19.

Plaintiffs, however, argue that there is "no general duty to disclose claims made on other risks." Arditti Decl. ¶ 29, citing McGillivray on Insurance Law ¶ 17-63. Plaintiffs aver Christodoulopoulos' claim on his Mortgagee's Interest Insurance policy for KASSANDRA is not obviously material to the marine hull claim for ELIKI. Plaintiffs also aver Christodoulopoulos' prior claim as an assignee of KASSANDRA is not material to his claim on ELIKI. Even if there are circumstances in which a previous claim may be a "material" fact to an underwriter, see Arditti Decl. ¶ 29, the underwriter is presumably interested in the care and competence exercised by an owner over his ship. As such, Christodoulopoulos' prior claim as assignee of a different owner's ship is not "material." Arditti Decl. ¶ 29. Plaintiff's expert also argues that Defendant underwriter's testimony that the statement was "material" is not dispositive, as the ultimate arbiter of "materiality" remains the Court. Id. at ¶ 28.

Genuine issues of material fact remain here. Primarily, the "materiality" of Christodoulopoulos' prior claim depends largely on the degree of constructive ownership he exercised after selling the KASSANDRA and retaining an assignee's interest, an issue which is unclear on the current papers before the Court. I am denying summary judgment to Defendants on their contention that Plaintiff's alleged misrepresentation as to his loss record allows Defendants to avoid the insurance contract entirely.[4]

    ii. Alleged Mooring Misrepresentation/Breach of Warranty

---

the same as the definition of "materiality" in the context of misrepresentation. See Jacobs Decl. ¶ 36, citing Marine Insurance Act of 1906, § 18(2).

[4] Additionally, it is unclear from the papers before me whether British law requires intent on the part of the misrepresenter (i.e. Christodoulopoulos, on behalf of Chrisnav) for the insurer to be allowed to avoid the contract, as British law does regarding fraudulent exaggeration of a claim, discussed infra. If intent is required, such intent would likely constitute another genuine issue of material fact for the Court.

7

Under the same theory of misrepresentation, Defendants seek to avoid the contract based on Christodoulopoulos' statement that "[t]he vessel will be laid up along side at the yard's berth."[5]

Defendants also argue that Christodoulopoulos' failure to properly "lay up" the vessel constitutes a breach of the express warranty requested by Underwriters. Thus, the insurer is entitled to terminate the insurance contract "even though the breach is material neither to the risk nor to any loss that has occurred." Jacobs Decl. ¶ 43, citing McGillivray at ¶ 10-37. In other words, according to Defendants, the insurers can terminate the contract even if the failure to "lay up" the vessel properly did not cause the instant damage. See Jacobs Decl. ¶ 43 ("causation is irrelevant"). Plaintiff agrees with this characterization of the law, but notes that breach is a "question of fact." Arditti Decl. ¶ 33.

Genuine issues of material fact remain regarding the propriety of Chrisnav's moorings and thus whether Chrisnav did, in fact, breach the contract.[6] Additionally, genuine issues of material fact remain as to whether Chrisnav's statement that "[t]he vessel will be laid up along side at the yard's berth" is a misrepresentation, particularly considering the differing characterizations of the moorings by both sides. As noted above, Defendants call the moorings an "old laid-up open type navy car carrier," while Plaintiffs call the moorings a "stable and secure barge." I am denying summary judgment to Defendants on their contention that Plaintiff's alleged misrepresentation as to the ELIKI's moorings allows Defendants to avoid the contract entirely.

    iii.  Alleged "Owner's Work" Exaggeration

---

[5] Defendants also argue that Plaintiff's misrepresentations as to a) the extent of his "hot work" and b) the experience of the Psychalis shipyards were material misrepresentations that allow them to avoid the contract entirely.

Regarding the "hot work," Defendants allege that Christodoulopoulos failed to inform the Underwriters that he was welding a second cover on the entire forward cabin. Regarding the Psychalis shipyards, Defendants apparently take umbrage with Christodoulopoulos' characterization of Psychalis as "experienced."

I am denying summary judgment to Defendants on both grounds because the materiality of both allegations remains a genuine issue of material fact.

[6] Defendant's brief states that "It is undisputed that the berth was not an approved berth." Def. Brief at 17. This is inaccurate. Plaintiff's brief notes that the Underwriters did not object at the time, and their own surveyors stated on January 14 that "the original mooring arrangements… were sufficient." Pl. Brief at 15. Clearly, disputed issues of fact remain.

Defendants allege that Christodoulopoulos performed "owner's work" on the ELIKI at the Vertopoulos drydock (i.e. installing a bow thruster) at the same time that casualty repairs were proceeding. They allege that Chrisnav included these costs in their claim, and that such exaggeration of their claim allows the insurers to avoid the contract entirely.[7]

Under British law, if an insured is determined to have presented a fraudulent claim, an insured's "exaggeration of a legitimate claim may entitle an insurer to avoid the claim." Jacobs Decl. ¶ 28, citing Agapitos v. Agnew (The Aegeon), QB 556 ¶ 30 (2003). However, the insured must "willfully or recklessly exaggerate the claim." Jacobs Decl. ¶ 29, citing Danepoint Ltd. v. Underwriting Ins. Ltd., 1 Ll.I.R. 429 ¶ 47-56 (2006). Plaintiff, on his part, stresses the requirement of "intent to defraud" or "recklessness," and avers "it would be extraordinary for so serious an allegation to be decided by a court on a summary basis without hearing the alleged fraudster's oral testimony." Arditti Decl. ¶ 26.[8]

Plaintiff is correct. Plaintiff's intent to defraud remains a genuine issue of material fact (let alone the genuine issue of whether Plaintiff did, in fact, submit "owner's work" that was not covered by the policy). I am denying summary judgment to Defendants on their contention that Plaintiff's exaggeration of "owner's work" allows Defendants to avoid the contract.

### iv. Failure to Timely Notify Insurer

Defendants argue that Chrisnav's failure to timely notify the insurers until more than two weeks after the initial loss constitutes a breach of good faith. See Jacobs Decl. ¶ 45, citing McGillivray on Insurance Law ¶ 19-34 n.16 (but noting "a curious absence of authority on the point"). Plaintiffs rebut, however, that notice is "a question of fact." Arditti Decl. ¶ 35.

---

[7] Alternatively, Defendant requests that I simply order the insurers' adjustment of the claim as judgment, because of Plaintiff's alleged exaggeration. I am denying summary judgment on this request owing to the same genuine issues of material fact as outlined above.

[8] "[I]t is perfectly normal for an adjuster to find that some parts of the claim are not recoverable without any suggestion of fraud." Id.

Given that notice is a question of fact, genuine issues of material fact remain as to what constitutes "late" notice, in the absence of any express contractual provision.[9] Plaintiffs note as well that Christmas and New Year's occurred shortly after the storm damage on December 23. Plaintiffs also aver that the insurers have demonstrated no prejudice arising from the late notice. Defendants' expert avers that Plaintiff's start of work before notification of his insurers "may have prejudiced the Defendants," see Jacobs Decl. ¶ 46, but he provides no details as to exactly how, and by how much.

I am thus denying summary judgment to Defendants on their contention that Plaintiff's late notice allows Defendants to avoid the insurance contract entirely.[10]

### b. **Exemplary Damages for Bad Faith or Egregious Conduct**

Plaintiffs have claimed exemplary damages for bad faith and egregiously improper claims settlement practices, owing to a) Defendant's refusal to pay amounts concededly owed to Plaintiffs unless Plaintiff settles the claim; b) Defendant's threats to void the contract unless Plaintiff settles the claim; and c) Defendant's refusal to provide an explanation for their failure to pay the claim.[11] Pl. Complaint at ¶ 54, 55.[12]

Defendants rebut that under British law, simply put, "an [insured] is not entitled to claim damages for bad faith on the part of insurers." Jacobs Decl. ¶ 7. Additionally, "there is no precedent or basis upon which an assured would be entitled to claim punitive

---

[9] Although the parties have not provided British law on the issue, one might surmise as well that where the contract is ambiguous on the issue, the intentions of the parties at contracting would be relevant, providing another issue of material fact that remains unsettled.

[10] Even if Defendants demonstrated late notice by Plaintiff, it is unclear what remedy Defendants are entitled to. Defendant's expert, after admitting that "it is unclear what the insurers' remedy would be for the breach," surmises that the insurer would either be entitled to extra damages for the extra expense due to the late notice, or could refuse to indemnify the assured to the extent that their investigation has been prejudiced. Jacobs Decl. ¶ 45. Were either of these the case, genuine issues of fact as to damages would remain.

Additionally, Defendants request as remedy that I order the insurers' surveyors adjustment of the claim as judgment. Defendants, however, cite no British law principle allowing a court to simply order an insurer's adjustment as judgment as remedy for late notification of a claim.

[11] Technically, Plaintiffs have claimed attorney's fees for "unfair claims settlement practice" and "bad faith," and exemplary damages for "egregiously improper conduct." It is unclear, from the British law provided on this motion, whether these are terms of art under British law, constituting different claims entailing different legal remedies.

[12] In the experts' declarations concerning "bad faith," there appears to be some discussion of the argument that Defendants may have waived some future defenses in their settlement offer to Plaintiffs. However, the issue does not appear to be before the Court in this motion, as Plaintiffs have not raised it in their briefs.

10

or exemplary damages from an insurer as part of an insurance claim." Id. at ¶ 8. Defendants then address Plaintiff's allegations specifically.

### i. Insurers' Refusal To Pay

Defendants provide several cases and treatises in support of the principle that an insured cannot bring a claim for bad faith or exemplary damages owing to the insurers' refusal to pay. First, there is no cause of action against an insurer for consequential damages caused by an insurer's unjustified refusal to pay a valid claim. See Jacobs Decl. ¶ 9, citing McGillivray on Insurance Law ¶ 19-12, 19-70, 19-71; Clarke – The Law of Insurance Contracts ¶ 30-9B1. Concomitantly, there is no cause of action against an insurer under the Marine Insurance Act of 1906 for "hardship, inconvenience, and distress" owing to a refusal to pay. See Jacobs Decl. ¶ 10, citing The Italia Express, 2 Ll.R. 281 (1992). Additionally, there is no cause of action against an insurer for late payment of damages; the insured's only remedy is interest. See Jacobs Decl. ¶12, citing Sprung v. Royal Insurance, 1 Ll.R. 111 at 116L, 119L (1999); Normhurst v. Dornoch, 1 Ll.I.R. 27, 28 (2005). Lastly, British law does not recognize a separate obligation upon the insurer when handling a claim over and above the liability to indemnify. See Jacobs Decl. ¶ 14, citing, e.g., The Star Sea, 1 Ll.R. 389, 400 (2001); HIH Casualty v. Chase Manhattan, 2 Ll.R. 483, 494 (2001).

Plaintiffs argue weakly that British precedent is not as "clear-cut" as Defendants propose. However, although Plaintiffs aver that the "door might be open," Plaintiffs fail to cite any exceptions to the general rule clearly applicable to this case. For example, in Sprung v. Royal Insurance, the Court noted in dictum that an exception might exist providing a cause of action against an insurer for late payment of damages where the policy's entire purpose was to provide immediate payment. Arditti Decl. ¶ 12, citing Sprung, 1 Ll.R. 111, 119. Plaintiffs' expert states that the instant marine hull policy is "arguably" such a policy, but provides no further analysis of the instant policy to support his claim.

Additionally, Plaintiffs argue that Section 17 of the Marine Insurance Act of 1906, providing for avoidance of the insurance contract for failure to exercise "utmost good faith," might provide an insured with a cause of action against an insurer for bad

11

faith based on an obligation over and above the duty to indemnify.  See Arditti Decl. ¶ 13.  British courts have held, however, that the insured's only avenue when an insurer fails to use "utmost good faith" is avoidance of the contract, not damages.  See HIH Casualty v. Chase Manhattan, 2 Ll.R. 483, 494 (2001).  Plaintiff's expert argues that courts have criticized this approach as "one-sided," see The Star Sea, 1 Ll.R. 389, 401-2.  But as Defendants note, this approach remains the law.

### ii.  Insurers' Failure to Explain Refusal/Threats to Void Contract

Defendants aver that "as a matter of law insurers are not required to explain their reasons for reserving their rights and/or [for] declining coverage."  Jacobs Decl. ¶ 15.  Additionally, insurers have no duty to "disclose its defences to the claim."  Id. at 18, citing MacDonald Eggers, Good Faith and Insurance Contracts ¶ 12-44 ("the duty of good faith does not exact a formal duty on the parties to cooperate.")[13]  Essentially, the only duty of the insurer is to not be fraudulent, pursuant to the "utmost good faith" requirement of Section 17.  Id.

Plaintiff's expert agrees that there is no authority "so far as concerns withholding of information by the insurer."  Arditti Decl. ¶ 18.  Plaintiff argues weakly that this should not be a "hard and fast rule"; and that additionally, the "utmost good faith" clause of Section 17 of the Marine Insurance Act of 1906 should be construed more strictly against the insurer than the insured.  However, as above, Plaintiff provides no binding authority for this proposition.

Because there appear to be no facts alleged by Plaintiff that could support a claim under British law for bad faith or exemplary damages, I am granting summary judgment to Defendant Underwriters on this issue and dismissing Plaintiff's claims for bad faith and exemplary damages.

---

[13] The parties do not clearly address the issue of Defendant Underwriters' "threats" to avoid the contract.  It appears that Plaintiff views the insurer's position that the contract is void as a "threat," while Defendants view it as "reserving its defenses."  Presumably, under the above analysis, Defendants believe they have a right to reserve their defenses, to not disclose them, or regarding this particular defense of avoidance, to disclose it as they see fit.

In any event, Plaintiff has provided no British law supporting that such a "threat" constitutes bad faith and entitles him to exemplary damages.  This argument is equally unavailing.

   c. **Indirect Costs**

Defendants have moved for summary judgment for a declaration that the insurance contract only provides for reasonable direct cost of repairs, as opposed to indirect costs. Thus, Defendants seek to avoid coverage for Plaintiff's claimed costs stemming from 1) Christodoulopoulos' hiring of his surveyor; 2) management fees; 3) Christodoulopoulos' hiring of an attorney; and 4) crew wages and associated costs.

Regarding the last category of crew wages and associated costs, Defendants aver that wages are specifically excluded pursuant to a standard form policy exclusion. Jacobs Decl. ¶ 47. The exclusion at issue provides that the insurer is "not liable for wages and/or provisions whether the average be particular or general." Id. Defendants note the general rule that "crew wages and provisions and other running expenses of the vessel are not recoverable under a hull policy." See Jacobs Decl. ¶ 48, citing Arnould – The Law of Marine Insurance and Average ¶ 1123. Plaintiff's expert agrees with this conclusion. Arditti Decl. ¶ 38. The parties do not address the other categories of indirect costs in their briefs.

I am thus granting Defendants' motion for summary judgment releasing Defendants from liability only for the discrete issue of crew wages and associated costs.

## IV.   CONCLUSION

This Court DENIES summary judgment to Defendants on all their various attempts to avoid liability under or void the insurance contract, because genuine issues of material fact remain. This Court GRANTS summary judgment to Defendants on Plaintiff's claims for bad faith and exemplary damages, because there appear to be no facts alleged by Plaintiff that could support such claims under British law. This Court GRANTS Defendants' motion for summary judgment releasing them from liability for the discrete issue of crew wages and associated costs.

The Clerk of the Court is directed to close this motion from my docket.

SO ORDERED.

November 30, 2006

New York, New York

_____
U.S.D.J.

14